JOPLIN MERCANTILE CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. April 3, 1914.)

No. 3942.

1. INDIANS (§ 35*)—ACT PROHIBITING CARRYING OF LIQUOR INTO INDIAN TERRITORY—EFFECT OF OKLAHOMA STATEHOOD.

Act March 1, 1895, c. 145, § 8, 28 Stat. 697, which inter alia prohibits the carrying of intoxicating liquors into Indian Territory, was enacted as a part of the recognized guardianship by the United States of the Indians as a separate but dependent people, and in the exercise of the constitutional power of Congress to regulate commerce with the Indian tribes, and was not repealed by the Enabling Act of Oklahoma, and the admission of the state thereunder, as to importations from parts of the state not within the former Indian Territory, and an indictment for conspiracy to violate said act by carrying liquor into such territory need not allege that it was to be imported from without the state of Oklahoma.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 61, 62; Dec. Dig. § 35.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. INDIANS (§ 35*)—INTRODUCING LIQUOR INTO INDIAN COUNTRY.—CONSTRUCTION OF ACTS.

In none of the legislation of Congress prohibiting the introduction of liquor into the Indian country have state lines been recognized, but the acts prohibited have always been held unlawful whether the liquor was introduced from points within the same state or from without.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 61, 62; Dec. Dig. § 35.*]

3. CORPORATIONS (§ 528*)—CRIMINAL LIABILITY—FELONIES.

A corporation may be indicted and convicted under Cr. Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [U. S. Comp. St. Supp. 1911, p. 1600]) § 37, for conspiracy to commit an offense against the United States by carrying liquors into Indian Territory or introducing liquors into the Indian country, although under section 335 of the Criminal Code (Act March 4, 1909, c. 321, 35 Stat. 1152 [U. S. Comp. St. Supp. 1911, p. 1687]) the offense is a felony.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2140–2144; Dec. Dig. § 528.*]

In Error to the District Court of the United States for the Western District of Missouri.

Criminal prosecution by the United States against the Joplin Mercantile Company and Joseph Filler. Judgment of conviction, and defendants bring error. Affirmed.

Paul A. Ewert, of Joplin, Mo., for plaintiffs in error.

Leslie J. Lyons, U. S. Atty., and Thad B. Landon, Asst. U. S. Atty., both of Kansas City, Mo.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. An indictment was returned for conspiracy under section 37 of the Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1096 [U. S. Comp. St. Supp. 1911, p. 1600]) charging that the Joplin Mercantile Company, a corporation existing under and by virtue of the laws of the state of Missouri, and one Joseph Filler, and one Ben Due, and one Martin F. Witte, and other persons to the grand jury unknown, hereinafter called the defendants, then and there being, did then and there unlawfully, willfully, knowingly, and feloniously conspire together to commit an offense against the United States of America, to wit, to unlawfully, knowingly, and feloniously introduce and attempt to introduce malt, spirituous, vinous, and other intoxicating liquors into the Indian country which was formerly the Indian Territory and now is included in a portion of the state of Oklahoma, and into the city of Tulsa, Tulsa county, Okl., which was formerly within and is now a part of what is known as the Indian country and into other parts and portions of that part of Oklahoma which lies within the Indian country. Certain overt acts were then alleged all of which charged that the defendants shipped liquors from Joplin, Mo., to Tulsa, Okl.

Ben Due pleaded guilty. The case against the Joplin Mercantile Company, Joseph Filler, and Martin F. Witte was tried to a jury who found the Mercantile Company and Filler guilty and acquitted Martin

F. Witte, and the Joplin Mercantile Company was fined, and Filler sentenced to the Leavenworth penitentiary, and they sued out a writ of error.

The only errors assigned which can be considered by us are:

(1) The court erred in overruling the demurrer of the defendants and each of them to the said indictment herein.

(2) The court erred in overruling the motion to quash said indictment herein made by the defendants and each of them.

(3) The court erred in overruling the motion in arrest of judgment herein made by the defendants and each of them.

Neither the evidence nor the charge of the court are before us.

The other questions covered by the assignments are with reference to the motion for a new trial which cannot be considered here and the admission of certain evidence which does not appear·in the transcript.

The questions, therefore, before this court can be resolved into one: Did the indictment charge an offense?

There are two separate systems of laws on the subject of liquors imported into the territory here in question. The Fifty-Second Congress, on July 23, 1892 (chapter 234, 27 Stat. 260), enacted the following as a substitute for section 2139 of the Revised Statutes:

"Sec. 2139. No ardent spirits, ale, beer, wine, or intoxicating liquor or liquors of whatever kind shall be introduced, under any pretense, into the Indian country. Every person who sells, exchanges, gives, barters, or disposes of any ardent spirits, ale, beer, wine, or intoxicating liquors of any kind to any Indian under charge of any Indian superintendent or agent or introduces or attempts to introduce any ardent spirits, ale, wine, beer, or intoxicating liquor of any kind into the Indian country shall be punished by imprisonment for not more than two years, and by a fine of not more than three hundred dollars for each offense. But it shall be a sufficient defense to any charge of introducing or attempting to introduce ardent spirits, ale, beer, wine, or intoxicating liquors into the Indian country that the acts charged were done under authority in writing from the War Department, or any officer duly authorized thereunto by the War Department. All complaints for the arrest of any person or persons made for violation of any of the provisions of this act shall be made in the county where the offense shall have been committed, or if committed upon or within any reservation not included in any county, then in any county adjoining such reservation, and, if in the Indian Territory, before the United States court commissioner, or commissioner of the circuit court of the United States residing nearest the place where the offense was committed, who is not for any reason disqualified; but in all cases such arrests shall be made before any United States court commissioner residing in such adjoining county, or before any magistrate or judicial officer authorized by the laws of the state in which such reservation is located to issue warrants for the arrest and examination of offenders by section ten hundred and fourteen of the Revised Statutes of the United States. And all persons so arrested shall, unless discharged upon examination, be held to answer and stand trial before the court of the United States having jurisdiction of the offense."

January 30, 1897, it being doubtful whether land allotted to Indians remained Indian country under the existing laws, the Fifty-Fourth Congress enacted Act Jan. 30, 1897, c. 109, 29 Stats. 506, in part as follows:

"Any person who shall introduce or attempt to introduce any malt, spirituous, or vinous liquor, including beer, ale, and wine, or any ardent or intoxicating liquor of any kind whatsoever into the Indian country, which

term shall include any Indian allotment while the title to the same shall be held in trust by the government or while the same shall remain inalienable by the allottee without the consent of the United States, shall be punished by imprisonment for not less than sixty days, and by a fine of not less than one hundred dollars for the first offense and not less than two hundred dollars for each offense thereafter."

But almost midway between the enactment of these two statutes the Fifty-Third Congress on March 1, 1895, enacted, chapter 145, 28 Stats. 693, 697:

"Sec. 8. That any person, whether an Indian or otherwise, who shall, in said [Indian] territory, manufacture, sell, give away, or in any manner, or by any means furnish to anyone, either for himself or another any vinous, malt, or fermented liquors, or any other intoxicating drinks of any kind whatsoever, whether medicated or not, or who shall carry, or in any manner have carried, into said territory any such liquors or drinks, or who shall be interested in such manufacture, sale, giving away, furnishing to anyone, or carrying into said territory any of such liquors or drinks shall, upon conviction thereof, be punished by fine not exceeding five hundred dollars and by imprisonment for not less than one month nor more than five years."

It will be observed that the first two statutes prohibited introducing liquor into the Indian country, but the last prohibited their introduction, not into the Indian country, but into the Indian Territory which had boundaries fixed by law.

The term "Indian country" has a constantly changing application, but the Indian Territory referred to is a well-defined and perpetually existing region.

In United States Express Co. v. Friedman, 191 Fed. 673, 112 C. C. A. 219, this court held that the two first statutes above quoted were still applicable to a considerable portion of the old Indian Territory.

In Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248, the Supreme Court held that the last-mentioned act, that of 1895, was still in force as applied to shipments from without Oklahoma.

In this situation this case was brought here in the belief that the decision in Ex parte Webb practically nullified our decision in United States Express Co. v. Friedman, but in United States v. Wright, 229 U. S. 226, 33 Sup. Ct. 630, 57 L. Ed. 1160, the Supreme Court also held, as held by this court in United States Express Co. v. Friedman, that the acts of 1892 and 1897 remained in force where applicable in Indian Territory, and the effect of this holding was that the acts of 1892, 1897, and 1895 all remained in force concurrently in Indian Territory.

If an indictment was returned which charged a defendant with introducing liquor into the Indian country upon the trial a question of fact would at once arise as to whether the place to which they were imported remained Indian country under the acts of 1892 and 1897; but, if the charge was under the act of 1895, the sole question would be whether the liquor had been carried into a geographical location fixed and determined.

It must be borne in mind that this was not an indictment for either of these offenses, but was an indictment for a conspiracy to violate both of these laws—introducing liquors into the Indian country which was formerly the Indian Territory. That one conspiracy could be

213 F.—59

formed to violate any number of laws of the United States seems beyond question. Here the conspiracy was the crime charged and not the introduction of liquors into the Indian country or the carrying of them into the Indian Territory.

It is contended that this conviction could not stand upon the act of 1895 because the indictment failed to charge that the conspiracy was to introduce liquors from without Oklahoma and that the overt acts alleged could not be utilized as the equivalent of such an allegation in the indictment, and reliance is placed upon Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248. In that case it was claimed the liquors were shipped from Joplin, Mo., and manifestly it could not involve the question as to whether the act of 1895 was repealed as to importations from parts of Oklahoma not in Indian Territory. It is true that in the Webb Case the Supreme Court said:

"We may thus proceed at once to the question of the effect upon the act of 1895 of the Oklahoma Enabling Act of June 16, 1906 (34 Stat. 267, c. 3335), and the admission of the state of Oklahoma into the Union pursuant thereto. Since the government concedes that the act of 1895 has been thereby repealed saving so far as it prohibited the carrying of intoxicating liquors, etc., from another state into the territory, the matter to be discussed is still further narrowed."

Again the court said:

"No doubt the Enabling Act, followed by the adoption of the Constitution therein prescribed and the admission of the new state, had the effect of remitting to the state government the enforcement of the prohibition respecting the manufacture, sale, barter, etc., of intoxicating liquors within the state, and respecting commerce in such liquors conducted wholly within the state; and, to the extent that the scheme of prohibition established by the Enabling Act covered the same field that had been covered by the act of 1895, the latter act must be considered as impliedly repealed."

If this latter clause stood alone, we would be much inclined to think the act of 1895 had been repealed as to carrying liquors from other parts of Oklahoma into Indian Territory, but the question was again before the Supreme Court in United States v. Wright, 229 U. S. 226, 33 Sup. Ct. 630, 57 L. Ed. 1160. In that case the Supreme Court said:

"In the Webb Case, as appears from the opinion [225 U. S. 676, 32 Sup. Ct. 769, 56 L. Ed. 1248], the government conceded that the act of 1895 had been repealed by the Enabling Act and the admission of the state thereunder, saving so far as it prohibited the carrying of intoxicating liquors, etc., from another state into the territory. The statement to the like effect in the opinion [225 U. S. 681, 32 Sup. Ct. 769, 56 L. Ed. 1248] was made in view of this concession; but we see no reason for recalling it."

The latter case, like the former, was a case of importation into the Indian country, but it was a case of importation into the Indian country from Oklahoma. The indictment was not under the act of 1895, but under the acts of 1892 and 1897.

Schaap v. United States, 210 Fed. 853, 127 C. C. A. 415, involved an indictment for introducing liquor into the Indian country and did not involve the carrying of liquor into Indian Territory. In that case it appears that the liquor was deposited at Ft. Smith, Ark., for trans-

portation into the part of Oklahoma that was formerly Indian Territory. It was an attempt at an interstate shipment. We are therefore of the opinion that it did not involve a decision upon the application of the act of 1895 to transactions wholly within the state of Oklahoma. In other words, that manifestly it did not involve the question whether the importation of liquors from other points in Oklahoma was illegal. In the opinion in that case the court said:

"General expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. Cohens v. Virginia, 6 Wheat. 264, 393, 5 L. Ed. 257; King v. Pomeroy, 121 Fed. 287, 294, 58 C. C. A. 209, 216; Traer v. Fowler, 144 Fed. 810, 817, 75 C. C. A. 540, 547; Mason City & Ft. Dodge Ry. Co. v. Wolf, 148 Fed. 961, 968, 78 C. C. A. 589, 596."

[1] These are all the cases that touch upon the question as to whether the act of 1895 was repealed as to the balance of Oklahoma. This question is now first presented to this court. We feel that, by so specifically pointing out in the Wright Case that all that was said upon the subject in the Webb Case was based upon the admission of the Government, it was distinctly foreshadowed that it would not be binding upon the court in the future, even though it was then said, "We see no reason for recalling it."

It seems time that some one discuss the question, as the government has heretofore conceded it without discussing it.

The effect of holding that the Enabling Act for the admission of the state of Oklahoma repealed the law of 1895 as to importations from parts of Oklahoma not in Indian Territory would in effect hold that importations remained prohibited from the north, south, and east of Indian Territory, but from the west they were turned over to the state.

The provisions of the Enabling Act requiring the prohibition provisions in the Constitution of Oklahoma is of no validity if Oklahoma sees fit to repeal it. She is on an equality with all of the states and can repudiate that and other provisions of the Enabling Act whenever she sees proper. The states are equal in power, and a new state when admitted is clothed with all the power of the original states and she can repudiate all the restrictions placed upon her that do not amount to a contract. Coyle v. Oklahoma, 221 U. S. 559, 31 Sup. Ct. 688, 55 L. Ed. 853. Why then would the admission of the state repeal the west boundary limit of this law?

In the exercise of its powers to regulate commerce with the Indian tribes, Congress has never recognized the boundaries of states as existent. As pointed out in the Friedman Case, the power to legislate in general with reference to liquor and the Indians is derived from: First, the treaty-making power; second, the power to regulate interstate commerce; third, the power to regulate commerce with the Indian tribes; fourth, the ownership, as sovereign, of lands to which the Indian title has not been extinguished; and, fifth, the plenary authority arising out of the guardianship of the Indians as an alien but dependent people.

Prior to the admission of the last of the territories here at home, Congress was also vested with the power to legislate on this subject by the provisions of the Constitution that:

"The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

If the act of 1895 was enacted in the exercise of the second of the powers enumerated in the Friedman Case, viz., the power to regulate interstate commerce, then it might well have been that the admission of Oklahoma repealed the statute so far as it applied to the introduction of intoxicating liquors from points of the state of Oklahoma not in Indian Territory. If it was enacted solely in the exercise of the power to enact legislation for the territories, then the admission of the state repealed the act in toto but did not repeal it upon the western side and leave it standing upon the north, south, and east sides.

Quite a different rule would prevail if it was enacted in the exercise of the third, fourth, or fifth powers enumerated in the Friedman Case, namely, the power to regulate commerce with the Indian tribes, the power to pass laws by virtue of its ownership as sovereign of land to which the Indian title had not been extinguished, and the authority of Congress arising out of its guardianship of the Indians as an alien but dependent people.

The law could not be assigned to the power to enact laws for the government of the territories because there is not an instance in the whole history of the federal government's dealing with the territories of a federal statute regulating the liquor business. That subject has been uniformly left to the territorial authorities, and the business has been carried on under such licenses or regulation as those authorized saw fit to impose.

Many considerations indicate that the act was passed as a part of the guardianship of the Indians and as a part of the power of Congress to regulate commerce with the Indians.

1. The federal government was under the most solemn pledges, contained in repeated treaties from the time the Indians were first removed to this district, to protect the Indians in their person and property against the evils of intercourse with people of the white race. History clearly shows that the greatest of those evils was the sale of intoxicating liquors.

2. Indian Territory contains the largest body of Indian population in the United States. It is not to be presumed that Congress intended to turn these Indians over to the protection of local authorities. This would be contrary to the uniform practice of the federal government in dealing with other Indian tribes in the various states.

3. Section 1 of the Enabling Act expressly reserves full authority to the national government for the protection of the Indians and their property, and thus shows clearly that it was not the intent of Congress in admitting Oklahoma, to remit the Indians to the control of the state. Protection of them against the liquor traffic has always been their greatest need, and it would be contrary to reason to suppose that the

reservation in the first section of the Enabling Act was not intended to cover that subject.

4. The numerous statutes passed by Congress at about the time Oklahoma was admitted, to protect these Indians against the evils of intoxicating liquor, show plainly that Congress intended to exercise this protection itself, and not to remit it to the state. It would be strange, indeed, if out of its abundant caution such a conflict has arisen as to wholly defeat this clear purpose of the federal government.

It is true that subdivision 2 of section 3 of the Enabling Act, containing provisions to be inserted in the constitution of the new state, provided that the Legislature might provide for one agency under the supervision of said state in each incorporated town of not less than 2,000 population and for one to a county in which there was no town of 2,000 inhabitants, for the sale of liquors for medicinal purposes and for the sale of denatured alcohol for industrial and scientific purposes.

This provision probably contemplated the repeal of so much of the act of 1895 as was necessary to enable the proprietors of such dispensaries to obtain intoxicating liquors, but there was no contemplation that if the state authorized such agencies they must obtain their liquors from within the state of Oklahoma. In other words this would be a repeal pro tanto of the act of 1895 upon all sides and not upon the western side. But such proviso or repeal in part of the act of 1895 need not be negatived even in an indictment for carrying liquors into Indian Territory. United States v. Cook, 17 Wall. 168, 21 L. Ed. 538; Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162. Still less would it be necessary to negative the proviso in an indictment for conspiracy to carry liquors into Indian Territory.

The same section of the Enabling Act required the state to prohibit for twenty-one years the sale of intoxicating liquors in Indian Territory. This was to secure the co-operation of the state authorities and was not intended to remit to the state the whole subject of the guardianship of the Indians on approach from the west.

[2] The courts have always held that state lines had nothing whatever to do with this subject. This has been in effect held in every case where a conviction has been had for introducing liquors into the Indian country from within the same state, but it has been squarely so held in United States v. Holliday, 3 Wall. 407, 18 L. Ed. 182; United States v. Forty-Three Gallons of Whisky, 93 U. S. 188, 23 L. Ed. 846; United States v. Forty-Three Gallons of Whisky, 108 U. S. 491, 2 Sup. Ct. 906, 27 L. Ed. 803; Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520; United States v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 200; Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750; United States v. Wright, 229 U. S. 226, 33 Sup. Ct. 630, 57 L. Ed. 1160; United States v. Sandoval, 231 U. S. 28, 34 Sup. Ct: 1, 58 L. Ed. ——; Sam B. Perrin v. United States, 232 U. S. 478, 34 Sup. Ct. 387, 58 L. Ed. ——; Joseph Pronovost v. United States, 232. U. S. 487, 34 Sup. Ct. 391, 58 L. Ed. ——; United States v. Barnhart (C. C.) 22 Fed. 285.

It thus appears that there was absolutely nothing even after the admission of the state to prevent Congress from prohibiting the importation of liquors into the Indian Territory peopled as it was so largely

by Indians, and there is therefore no reason to believe that the admission of the state was intended to repeal this law on the western boundary of the Indian Territory.

If the United States had power to prohibit the introduction of liquors illegally from Oklahoma and from other states into Indian Territory, upon what basis could it be held that the admission of the state repealed the western boundary of prohibition but left standing the prohibition upon the north, south, and east?

Why were these two systems of laws originally enacted? The general allotment law had been in force some years when the act of 1895 was passed. It was manifest that much of what had heretofore been Indian country would soon cease to be such, but Congress wanted to protect the Indians against intoxicating liquors and did not want them admitted to the territory and therefore prohibited their importation absolutely. Nothing could better illustrate the danger than what has happened. It is now lawful under the acts of 1892 and 1897 to ship liquors across Indian country if the point of destination is not Indian country and Indian Territory may be flooded with liquors under the acts of 1892 and 1897. On the other hand, if the act of 1895 was alone in force prohibiting the carrying of liquor within the Indian Territory, why would it be unlawful to transport liquor from a point within the Indian Territory to an allotment therein? It was therefore necessary to maintain the provisions of 1892 and 1897 prohibiting the introduction of liquor into the Indian country.

It is claimed that in some way the western boundary of 1895 was taken down and the government turned over to the state of Oklahoma the guardianship of its wards.

So long as Congress had the right to prohibit the introduction of liquor from Oklahoma into Indian Territory, there should be some clearly defined statute to indicate that Congress abandoned its guardianship and turned it over to the state, and neither the government nor the defendants have ever attempted to point out how was thus abdicated the exercise of congressional powers.

It was not necessary, therefore, for the indictment to allege the conspiracy was to import liquors into the Indian Territory from without Oklahoma.

The conviction may also be sustained upon another ground. The indictment charged a conspiracy to violate the laws of 1892 and 1897 to introduce or attempt to introduce liquors into the Indian country and into the city of Tulsa, which is now a part of what is known as the Indian country, and to other parts and portions of Oklahoma which lie in the Indian country.

That the laws of 1892 and 1897 are in force in the territory named is beyond question since the decision in United States v. Wright, 229 U. S. 226, 33 Sup. Ct. 630, 57 L. Ed. 1160.

An inspection of the opinion in Schaap v. United States of America will show that this court held that, if the place which was charged to be within the Indian country was not so situated, that was a matter for proof upon the trial, and we have before us none of the evidence, and no objection to the indictment could be made upon that ground.

If we should even take judicial notice of the fact that Tulsa was not in the Indian country, the indictment charged that the conspiracy was to introduce liquors into other parts or portions of Oklahoma which lie within the Indian country, and, until we should take judicial notice that no portion of Oklahoma was within the Indian country, the objection to the indictment could not be sustained.

[3] The plaintiffs in error suggest the question: "Can a corporation be lawfully indicted and convicted for a conspiracy which by statute is declared a felony?"

This question was not especially called to the attention of the District Court by any of the subdivisions of the demurrer, motion to quash, or motion in arrest of judgment; but, as the counsel for the plaintiffs in error says that this was presented to the court below upon the argument, we will briefly consider it, although we are not prepared to say that it is pending for consideration here.

"All offenses which may be punished by death, or imprisonment for a term exceeding one year, shall be deemed felonies. All other offenses shall be deemed misdemeanors." Penal Code, § 335.

It follows as the offense of conspiracy may be punished by imprisonment for not more than two years, Penal Code, § 37, the offense here charged was a felony. The statute provides, however, that each of the parties to the conspiracy shall be fined not more than $10,000 or imprisoned not more than two years or both. The mercantile company in this case was fined.

Owing to the changes from time to time by statute in the meaning of the term "felony," it is perhaps more apt to become misleading than otherwise. The meaning of the term "felony" is a growth. Originally it meant an offense which occasioned a forfeiture of the lands or goods of the offender as distinguished from a mere money fine. The actual offense here charged was subject to the same punishment before the enactment of the Criminal Code. Rev. St. § 5440; Act May 17, 1879, c. 8, 21 Stat. 4 (U. S. Comp. St. 1901, p. 3676). Yet it was not a felony. Bannon v. United States, 156 U. S. 464, 15 Sup. Ct. 467, 39 L. Ed. 494.

In that case, as if anticipating the action of Congress by nearly 15 years, the court said:

"And even if it were made a felony by statute, the indictment would not necessarily be defective for failing to aver that the act was feloniously done."

It is manifest that whether a corporation can be convicted of a criminal offense depends, not upon technical name, treason, felony, or misdemeanor, attached to the crime, but is one of whether the crime is such that the corporation is capable of committing it.

In Bishop's New Criminal Law, par. 417, upon the sole authority of the author, it is said:

"2. Its Criminal Capabilities Defined.—A corporation cannot in its corporate capacity commit a crime by an act in the fullest sense ultra vires and contrary to its nature. But within the sphere of its corporate capacity, and to an undefined extent beyond, whenever it assumes to act as a corporation it has the same capabilities of criminal intent and of act—in other words, of crime—as an individual man sustaining to the thing the like relations."

As the evidence is not here, it cannot be told what was the scope of the authority of this particular corporation, but it was doubtless its business to sell liquors.

In Cook on Corporations (6th Ed.) vol. 1, p. 94, it is said:

"Even where it is necessary to prove a fraudulent and malicious intent it is held by the great weight of modern authority that the fraud and malice of the authorized agents of a corporation may be imputed to the corporation itself."

See, also, on the imputability of crime to corporations, Wharton's Criminal Law (11th Ed.) par. 119.

It has been repeatedly held in civil cases that a corporation may be a party to a conspiracy. Aberthaw Co. v. Cameron, 194 Mass. 208, 80 N. E. 478, 120 Am. St. Rep. 542; White v. Apsley Rubber Co., 194 Mass. 97, 80 N. E. 500, 8 L. R. A. (N. S.) 484; Buffalo Lubricating Oil Co. v. Acme Oil Co., 106 N. Y. 669, 12 N. E. 825.

In Thompson on Corporations (2d Ed.) 5440, it is said:

"A corporation is liable for conspiracy to the same extent as are individuals under like circumstances."

And see Id., par. 5632.

And in Chicago W. & V. Coal Co. v. People, 214 Ill. 421, 73 N. E. 770, it was expressly held that a corporation could be indicted and convicted of a conspiracy at common law.

The plaintiffs in error cite State v. Delmar Jockey Club, 200 Mo. 34, 92 S. W. 185, 98 S. W. 539.

That was a civil case, and its statement therefore in accordance, however, with the ancient holdings that a corporation could not be guilty of a felony, while somewhat persuasive, is not controlling with us because the question was not involved in that case.

They also cite Commonwealth v. Proprietors of New Bedford Bridge, 2 Gray (Mass.) 339. That also was a civil case, but held the company liable for nuisance.

These are the only cases cited on the subject by the plaintiffs in error.

Upon the other hand, see United States v. Union Supply Co., 215 U. S. 50, 30 Sup. Ct. 15, 54 L. Ed. 87; Cohen v. United States, 157 Fed. 651, 85 C. C. A. 113, and United States v. MacAndrews Co. (C. C.) 149 Fed. 823.

The whole growth of the modern law tends to subject corporations, as nearly as may be, to the same pains and penalties imposed upon individuals. Of course, if the law imposed a death penalty or personal imprisonment, a corporation could not be subjected thereto.

Suffice it to say that we think that a corporation could be guilty of a conspiracy to carry liquor into Indian Territory and to introduce it into the Indian country.

The judgment of the District Court is affirmed.